STATE OF MISSISSIPPI ET AL. *v.* MOBILE, JACKSON & KANSAS
CITY RAILROAD COMPANY.

1. RAILROADS. *County seats. Constitution* 1890, *sec.* 187. *Natural obstacles. Right of way. ·Depot grounds. Demand.*

Under Constitution 1890, sec. 187, providing that no railroad should be constructed so as to pass within three miles of a county seat without passing through the same and establishing a depot there, unless prevented by natural obstacles, if the town or its citizens should grant the right of way through its limits and sufficient depot grounds:

(*a*) The words "county seat" mean the municipality at which the county seat is located according to its boundaries when the road is constructed; and

(*b*) The terms "natural obstacles" mean such obstacles as cannot reasonably be overcome, and neither increased costs nor greater engineering difficulties will alone and of themselves excuse non-performance of the duty; and

(*c*) It is no excuse to the railroad company for failing to build through a county site that it has not been tendered a conveyance of the right of way and depot grounds, unless it shows that it made a demand for such conveyance and had been refused; and

(*d*) A county seat is not required to furnish a right of .way and depot grounds to a railroad already built to it, upon its extension from it; and

(*e*) A county seat which is a terminus of a railroad already constructed is not required to furnish a right of way and depot grounds for an extension of the road.

2. SAME. *Change of route. Railroad commission.*

Where a railroad has located and constructed its line so that property rights have become fixed with reference thereto, it cannot abandon any portion of the line so located except on the score of imperious necessity, nor abolish or disuse and cease to maintain a depot in a town traversed by it without the consent of the railroad commission, unless demanded by business necessity or public convenience; and, in case a change of the depot site is thus necessary, the railroad must still locate a new depot on the line of its established route within the limits of the town.

3. SAME.   *Consolidation.*

Where a railroad authorized to construct a line through a certain district is permitted by the railroad commission to consodidate with an already existing line, with which it would otherwise compete, on the strength of its promise to widen the existing line from a narrow to the standard gauge and operate it as part of its line, the consolidated corporation is bound to broaden the narrow-gauge line and maintain it along the route which it has been accustomed to follow, and cannot abandon part of the narrow-gauge line for a different route or abandon a depot located thereon.

4. SAME.   *Lessee.   Rights.*

A lessee railroad has no greater right with respect to the leased property than its lessor, and is bound to perform the duties devolving on the lessor.

5. SAME.   *Change of route.   Code* 1892, § 3599.

Code 1892, § 3599, authorizing a railroad, after beginning the construction of its road, to make all necessary or proper changes in its course or direction from that specified in the application for its incorporation, does not authorize a new railroad which consolidates with an existing railroad to form a through line to abandon a portion of the existing line and construct the through line over another route.

6. SAME.   *Depots.   Location.   Code* 1892, § 4309.

Under the express provisions of Code 1892, § 4309, depots must be located with due regard to the interests of the railroad and the public convenience, and the railroad commission may designate the location of a new station house in case the site selected by the railroad officials is inconvenient or inaccessible.

7. SAME.   *State.   Party to suit.*

The state is a proper party to a suit to enjoin a railroad from constructing and operating its line without passing through a certain town and to prevent it from abandoning a portion of the road formerly operated by its predecessor in interest, and upon which a depot had been maintained at the town.

8. SAME.   *Code* 1892, § 3587.   *Laws* 1898, *p.* 95, *ch.* 80.   *Parallel roads not to consolidate.*

Under Code 1892, § 3587, and Laws 1898, p. 95, ch. 80, both of which forbid parallel or competing railroads to consolidate, and permit other railroads to consolidate only upon the approval of the railroad commission, a special law granting to competing

railroads power to consolidate, or authorizing one to purchase the other, is repugnant to Constitution 1890, sec. 87, forbidding the suspension of a general law for the benefit of any individual or private corporation or association.

FROM the chancery court of Pontotoc county.

HON. WILLIAM J. LAMB, Chancellor.

The state of Mississippi and the Mississippi Railroad Commission, the appellants, were complainants in the court below; the railroad company, the appellee, was defendant there. From a decree in defendant's favor, dissolving an injunction, the complainants appealed to the supreme court. The facts are fully stated in the opinion of the court.

Section 187, of the constitution, is as follows: "No railroad hereafter constructed in this state shall pass within three miles of any county seat without passing through the same, and establishing and maintaining a depot therein, unless prevented by natural obstacles; *Provided,* Such town or its citizens shall grant the right of way through its limits, and sufficient grounds for ordinary depot purposes."

*J. N. Flowers,* assistant attorney-general, for appellants.

1. That the consolidated corporation and its lessee are bound to preserve and maintain intact the original narrow-gauge line extending into the town of Pontotoc to the old depot site. We contend that this is the law regardless of sec. 187 of the constitution and regardless of any statutory laws of this state. *Lusby* v. *Railroad Co.,* 73 Miss., 360; *Ewing* v. *Railroad Co.,* 68 Miss., 551; *Railroad Co.* v. *Devaney,* 42 Miss., 555; *Leverett et al.* v. *Middle Ga. Ry. Co.,* 96 Ga., 385; *Works* v. *Railroad Co.,* No. 18046 Fed. Cas.; *People* v. *Railroad Co.* 45 Barb., 73; *Mason* v. *Railroad Co.,* 35 Barb., 373; *Little Miami Railroad Co.* v. *Naylor,* 2 Ohio St., 236; *Moorehead* v. *Railroad Co.,* 17 Ohio, 340; *People* v. *Railroad Co.,* 120 Ill., 48, 65; Woods, Railroad Law, vol. 2, pp. 752, 950; 3 Elliott on Railroads, secs. 929 and 930.

2. That under sec. 3599 of the code the narrow-gauge line is to be treated as an established line, and the railroad company controlling it has no power to move it without the consent of the railroad commission; that under sec. 4302 the building of the new line necessitates the establishment of a new depot and a change of location, and that this cannot be done without the consent of the railroad commission, as provided by the latter part of said section. Code 1892, § 3599; Code 1892, § 4302; *State* v. *New Haven & Northampton Co.,* 37 Conn., 153.

3. That independently of the laws of the state and the general laws, the consolidated corporation and its lessee are bound, under the stipulations in its petition presented to the railroad commission for said body's consent to the consolidation, to maintain intact the said narrow-gauge line and broaden and standardize it throughout its entire length and make it a part of the main new line extending from Decatur, Mississippi, to Jackson, Tennessee. *Railroad Co.* v. *Railway Co.,* 83 Miss., 746.

4. That if the line by Pontotoc is to be treated as an established line, it must be built where the old line was built; if it is to be treated as a new line to be located, then sec. 187 of the constitution must be complied with and the new line must be run through the original town of Pontotoc, if the citizens of Pontotoc, as they have offered to do, will perform their part under the said sec. 187 of the constitution. *Marengo County et al.* v. *Matkin et al.,* 32 South. Rep., 669.

5. That in any event the decree of the chancellor is wrong in that it does not decide any question upon the solution of which our right to relief depends, but undertakes to dissolve the injunction for other reasons not proper to be considered in this controversy.

*R. V. Fletcher,* on same side.

There are two important questions involved in this case:

First—Is sec. 187 of the constitution applicable to the facts of this case?

Second—Is the railroad company bound by the stipulations of the petition asking for permission to consolidate?

Section 187 of the Mississippi constitution provides that no railroad to be hereafter constructed shall pass within three miles of a county seat without passing through the same, unless prevented by natural obstacles, provided the municipality or its citizens will give the right of way and depot grounds. The facts of this case show beyond cavil that this particular railroad is being constructed and operated within less than one mile of the county seat and that it does not touch the county seat. It appears further that there are no natural obstacles, and that the citizens stand ready and willing to donate a sufficient right of way and ample depot grounds. These facts being established, the case seems clear.

In the first place, it is not pretended that the line of defendant's railway at any point touches the county seat of Pontotoc county, as the same was established by the legislature and declared to be the county seat of Pontotoc county. It is true that the line passes through a portion of the extended corporate limits of the town of Pontotoc. But this extension was made effective in 1903, after the depot was located and established, and the annexed area is no part of the county seat. There is absolutely no conflict of authority upon the proposition that an extension of the corporate limits of a municipality does not serve to extend the boundaries of a county seat. The county seat is established for county purposes, and has no connection with any municipal corporation. It need not be a part of an incorporated village or town, and often is not. It does not depend upon, nor is it affected by, any action of the municipal authorities in extending or contracting the corporate limits of the town, city, or village in which it may chance to be situated. This is clearly expressed, and all the authorities are collated

and considered in the Marengo county case, decided in Alabama, 32 South. Rep., 669. This should be conclusive upon the proposition that the extension of the corporate limits of a municipality does not serve to extend the area of a county seat.

But it may be contended that appellees are in no attitude to invoke this constitutional provision because the town of Pontotoc or the citizens thereof have not provided a right of way through the town and sufficient grounds for ordinary depot purposes. It may be contended that this is a precedent condition, and that it must be shown affirmatively that it has been complied with before the railroad company can be considered as being in default. It will be noted that the bill charges a readiness on the part of the citizens of the town of Pontotoc to supply these things. Further, a number of the citizens state on oath that they are ready to furnish the right of way and depot grounds.

But the testimony of the locating engineer for the defendant company shows that no route has ever been surveyed through the county seat, none ever considered, no demand made by the railroad company, no site selected, and the citizens have never been in a situation to tender or offer a right of way or depot grounds to the railroad company. On the other hand, there has been a continued and persistent refusal on the part of the railroad company to even consider or talk about any other line, or any other depot site, than the one actually selected. It is an elementary principle of law of contracts that if the performance of a necessary condition is incumbent on one party, an absolute refusal of the other party to accept it excuses the obligated party from performing the condition. Thus it has been said:

"One of the two parties should not be required to tender performance when the other has by act or word indicated that he will not or cannot accept it, or will not or cannot do that in

return for which the performance was promised." 9 Am. & Eng. Ency. Law, 641, par. 5.

This states the attitude of the instant case exactly. That this is the correct view can be seen by considering the situation of the parties and the subject-matter of the thing to be offered or tendered. The railroad company alone could intelligently say what route through the county seat should be selected. They alone could be competent to judge of its practicability and suitability. The citizens might tender the right of way along a route that to their untechnical eyes might appear perfectly feasible and practicable, and yet it might not be suitable to the purposes of the road. Indeed, it would be no violent assumption to say that in the case at bar the defendant company would not be easy to please in this matter. When the citizens have offered at every opportunity to furnish a right of way and suitable depot grounds, and the railroad company has refused to select a route and has insisted that under no circumstances would they locate their line of railway through the county seat, certainly the people of the town will be excused from doing so vain a thing as making a formal tender of some particular right of way.

But it may be argued that the old depot site is not itself within the limits of the county seat. It is true that all the grounds are not, but a part of them is. It must be remembered that this is not a controversy between the old depot site and the new. The question is, Shall sec. 187 of the constitution be complied with? Whether the old depot site shall be retained or abandoned is not involved in this particular case. Besides, the maps and plats filed as exhibits in this case show that the old depot property is partly within the county seat limits, and that by making a slight alteration in the location of the depot the constitution can be obeyed without serious consequences or inconvenience to the company.

It is the contention of appellants that the said railroad company has violated the very condition of its existence in aban-

doning and refusing to standardize the narrow-gauge line of railway. The petition filed by the railroad companies before the State Railroad Commission states positively that they will broaden and standardize the narrow-gauge line to the town of Pontotoc. The proof in this case shows that the narrow-gauge line was abandoned north of the corporate limits of the town, and that in all about one mile of the narrow-gauge line has been entirely abandoned. By Code 1892, § 3587, the consent of the railroad commission is absolutely essential to the very existence of a consolidated corporation. It cannot exist without it. Now the consent in the instant case was obtained upon the express agreement and condition, and in violation of this condition the company has broken faith with the railroad commission and violated the very condition of its existence. This arrangement has all the essentials and peculiarities of a contract; and, the railroad company having violated its pledge, certainly an injunction lies to prevent this breach of faith. It will not do to say that no great or irreparable injury is done. It is an irreparable injury when any law is broken or constitutional provision is ignored. It is, besides, an irreparable injury to the business men and citizens of the town of Pontotoc, whose property values have vastly depreciated, whose expenses have been augmented, whose convenience has been interfered with. The affidavits in this case disclose an intolerable state of affairs, amounting to a wholesale confiscation of property, to a gross and amazing disregard of the rights of the public, to an inexcusable attack upon a prosperous and thriving community, to a brazen defiance of law and authority, which is almost, if not quite, without parallel.

*J. W. T. Falkner,* for appellee.

The power to dissolve as well as to grant injunctions must rest necessarily in the discretion of the court, and should be

180 STATE *v.* RAILROAD CO. [Apr., 1905.

exercised so as to prevent injustice. Hilliard on Injunctions, 77; *Bowen* v. *Hoskins,* 45 Miss., 183.

The question in this court is not, Is the order of the chancellor clearly right? but, Is it manifestly wrong? and it is incumbent on the appellant to show affirmatively and clearly the error in the order of the court below. *Derdeyn* v. *Donovan,* 33 South. Rep., 652; *Steadman* v. *Holman,* 33 Miss., 550; *Melchoir* v. *Kahn,* 38 South. Rep., 347, and authorities.

The rule that an injunction will be dissolved upon motion when the equities of the bill are distinctly denied by a sworn answer is subject to only one exception—that is, where serious or irreparable injury would be done a complainant by dissolution, while that of the defendant by its retention would be slight and easily compensated. See *Jones* v. *Brandon,* 60 Miss., 556.

The injunction was properly dissolved because the injunction issued upon the prayer of the bill imposes a direct and unnecessary burden upon interstate commerce and interference with the carrying of the United States mails prohibited by art. 1, sec. 8, of the constitution of the United States.

The state of Mississippi has no such interest in this litigation or in the question involved as to make it a necessary or even a proper party. Under the statutes of this state the railroad commission has the right to call in the aid of the courts of the state to enforce obedience to its lawful orders or to prevent violation of law, and while it is true that the state government does and should have a pride in the obedience to its laws, yet that is not such an interest as will make it a necessary party. The bill charges that the defendants are constructing a line of road within three miles of the town of Pontotoc without going through the county seat, as originally planned and laid out, in violation of sec. 187 of the constitution of the state of Mississippi.

This is emphatically denied by the answer and is supported

fully by the evidence submitted and considered by the court below.

The action of the court below in dissolving the injunction is correct, because by the said bill and injunction thereon defendant is prohibited from building its line of road outside the original plan of the town of Pontotoc and within three miles of said town without having been furnished with right of way through said town and sufficient grounds for depot purposes within said original plan of said town, or offering to do so.

The proviso to sec. 187 of the constitution is a condition precedent to the enforcement of the section and demands that the citizens of the town or the town shall provide the right of way and sufficient depot grounds for ordinary purposes.

The mere statement in the bill that complainant is informed that the citizens stand ready to do so, etc., is not sufficient, and it is not sufficient to sustain the allegation of the bill that three or four property holders should testify "that they were willing to donate the money to buy rights of way and depot grounds, if the court should hold they ought to do so or were by law required to do so," etc. This must be shown to have been done before the filing of the bill to enforce obedience to the section; it is a condition precedent to the enforcement of this section of the law, and without it the section is void.

The injunction was properly dissolved because the railroad company is in no default in building its line of road outside said town of Pontotoc, and because the record and proceedings in this case show that complainant, the Mississippi Railroad Commission, has heretofore ordered defendant to rebuild its depot on the old site, on the line of the narrow-gauge railroad in the town of Pontotoc, which said order was enjoined by the defendant in the United States circuit court for the southern district sitting at Jackson, Mississippi, and the suit thereon is now pending, in which all of the matters and things in this suit can be determined.

The injunction should be dissolved because the relief sought in this case is entirely inconsistent with complainant's, the railroad commission's, said order heretofore issued, directing the defendants to rebuild the depot on the old site, and is in direct conflict therewith. The railroad commission issued an order directing the defendants to rebuild the depot on the old site; in the case at bar the defendants are enjoined from constructing or operating the road within three miles of the town of Pontotoc without running through the original plan of the town. It is shown clearly in the answer and the affidavits and the blue print in evidence that the old site is not in the original plan of the town.

Argued orally by *J. N. Flowers,* assistant attorney-general, and *R. V. Fletcher,* for appellants; and by *J. C. Rich, J. D. Fontaine,* and *Jno. W. T. Falkner,* for appellee.

TRULY, J., delivered the opinion of the court.

This appeal is prosecuted from a decree dissolving an injunction. The bill of complaint filed by the appellants sought to enjoin the Gulf & Chicago Railway Company, the successor by consolidation of the Gulf & Chicago Railroad Company and the Mobile, Jackson & Kansas City Railroad Company, as the lessee of the Gulf & Chicago Railway Company, the consolidated corporation, from constructing and operating its line of railway without passing through the town of Pontotoc, the county site of Pontotoc county, in this state, as required by sec. 187 of the constitution, and sought also to prevent the appellees from abandoning a portion of the railroad formerly operated by the Gulf & Chicago Railroad Company, which ran to, and upon which had previously been maintained a depot at, the town of Pontotoc. The prayer of the bill of complaint was that an injunction should issue against the said railroad companies, who were made defendants, "temporarily restraining them, and each of them, from constructing and

operating the said proposed line of railroad, passing within three miles of the said county seat, without passing through the same, and upon final hearing that they be perpetually enjoined from building and operating a railroad along said route, and commanding them to broaden and standardize the said line of railroad extending into the said county seat of Pontotoc county, as it has been established for years, and as the said consolidated corporation agreed to do from the point north of the said county seat from which said narrow-gauge line has been abandoned, and that the said defendants be required to operate the said line into the said county seat as a part of the line built and to be built from Decatur, Mississippi, to Jackson, Tennessee, and that they be commanded to extend the line on through the said county seat, as required by said sec. 187 of the constitution of the state of Mississippi, and as required by law, and by the order of the complainant, the Mississippi Railroad Commission." This bill was filed and injunction issued on the 2d day of August, 1904. Answer was duly filed; motion to dissolve on bill, answer, and proof was heard; the injunction was dissolved; and from that ruling of the chancellor this appeal is prosecuted in order "to settle the principles of the cause."

For many years prior to the institution of this suit the Gulf & Chicago Railroad Company had operated a line of narrow-gauge railroad from the town of Pontotoc, in the state of Mississippi, to the town of Middleton, in the state of Tennessee. That road ran in a northerly direction, traversing a portion of the county of Pontotoc and the counties of Union and Tippah, crossing the state line at or near the town of Broomfield, in the county of Tippah. This road was in active operation, carrying both freight and passengers, at the date of the incorporation under the laws of this state of the Gulf & Chicago Railway Company. This latter road, by proclamation of the governor, was, in due form, incorporated on the 17th day of April, 1903, and the incorporators were by such authorization em-

powered "to organize a railroad company with the terminal points of said road at Decatur, in the state of Mississippi, and Jackson, in the state of Tennessee; the said line of railroad to extend in a northerly direction from the town of Decatur, in the county of Newton, passing through the counties of Neshoba, Winston, Choctaw, Webster, Chickasaw, Pontotoc, Union, and Tippah into the state of Tennessee, crossing the state line at or near the town of Broomfield, in the county of Tippah." Subsequently an application was made to the railroad commission of the state of Mississippi, asking for its consent and approval to the consolidation of the Gulf & Chicago Railway Company, a Mississippi corporation, the Gulf & Chicago Railway Company, a Tennessee corporation, and the Gulf & Chicago Railroad Company, a corporation existing under the laws of both states. In this petition for permission to consolidate, it was averred that "the lines of railroad owned and operated and controlled and projected by the constituted companies composing said consolidation were and are in no ways parallel or competing lines. On the contrary, the consolidation was effected for the single purpose of furthering the general plan of building and equipping and thereafter operating a single-track, standard-gauge line of railroad, extending in a general northerly direction from the town of Decatur, Mississippi, to the city of Jackson, Tennessee. The present constructed narrow-gauge railroad, acquired from the Gulf & Chicago Railroad Company, and running between the towns of Pontotoc, Mississippi, and Middleton, Tennessee, will be broadened and standardized, and will thereupon become a part of the line of railroad operated by the consolidated corporation." Acting on this representation, the commission passed an order permitting and approving the proposed consolidation of the corporations, the order reciting that "it appearing to the satisfaction of the commission that said corporations do not own or operate parallel or competing lines of railroad." After the consolidation was consummated in pursuance of this permission, the

Gulf & Chicago Railway Company, the corporation resulting from the consolidation, leased the entire property, including the narrow-gauge railroad which it had acquired from the Gulf & Chicago Railroad Company, to the Mobile, Jackson & Kansas City Railroad Company. Thereupon the said lessee began the construction of a line of railroad over the route mapped out by the charter of its lessor from Decatur, Mississippi, to Jackson, Tennessee. When this line approached, but before actually reaching, the town of Pontotoc from the north, it diverged from the line of narrow-gauge railroad which was then in actual operation, abandoning a mile or more of that line, with the intention of following another, and, according to the testimony of its locating engineer, a cheaper and more feasible, route. This projected line, as surveyed, left the original town of Pontotoc over a mile distant, but traversed an extension of said town, and located a depot on the new route, three-fourths of a mile distant from the site of the old depot, but still within the corporate limits of the town as they then existed. When it became manifest that the intention of the railroad company was to abandon this portion of the narrow-gauge line, and that its new line, while passing within three miles of the original town of Pontotoc, would not pass through its corporate limits, this proceeding was instituted by the appellants, praying for an injunction, which was granted, forbidding the construction of the new road over the projected route, and further asking that on final hearing a mandatory injunction should be issued, compelling the broadening and standardizing of the narrow-gauge line, as set forth in the petition for consolidation, and forbidding the abandonment of any portion thereof. Upon the hearing of the motion to dissolve, much proof was taken tending to establish, on the one hand, that the location of the depot upon the original site on the narrow-gauge line of the Gulf & Chicago Railroad Company at the town of Pontotoc, which had been destroyed by fire, and not rebuilt, in flagrant disregard and defiance of the order

of the railroad commission, was in pursuance of a written contract entered into between the citizens of the town and the chief officials of the railroad company at that date, by which, in consideration of $5,500 cash in hand paid by the citizens, the depot was located on the site then selected, and was, under the provisions of that contract, to be there perpetually maintained. It was also in proof that the removal of the depot from the old site to the new location selected on the new route would have the effect of materially decreasing the value of all adjacent property, and of increasing considerably the cost of drayage and hauling of freight both to and from the newly selected site for the depot and the original town of Pontotoc, where the majority of the mercantile establishments and other business enterprises were situate. It was shown by the testimony of engineers that a perfectly practicable route, without undue curves or unusual engineering difficulties, could be laid out for the building of a standard-gauge railroad, which would run over the entire narrow-gauge roadway, and thence, extended, traverse the corporate limits of the old or original town of Pontotoc, and come again to the new route as located by the railroad engineering corps at a point a short distance south of the town, and that such line would increase the length of the line by less than a mile, and necessitate but a slight deviation from the projected route. On the other hand, it was shown, also by the testimony of engineers, that it would cost many dollars more to adopt the route then occupied by the narrow-gauge line than it would to use the more direct route located for the construction of the road, and that the latter line would be cheaper to build, would be more direct, and would present fewer engineering difficulties. It was further contended that there were no sufficient or suitable grounds available for depot site, with sufficient and adequate trackage room for a standard-gauge road, within the borders of the original town of Pontotoc; that there was no contract requiring the maintenance of the depot at the original location, and, if there

was such a contract, it would be void, as a violation of public policy; that the petition for permission to consolidate imposed no burden of maintaining the entire narrow-gauge road; that the Mobile, Jackson & Kansas City Railroad Company had the authority to make all necessary or proper changes in its course or direction, even if such change or deviation resulted in the abandonment of the existing narrow-gauge road. It is worthy of note, however, that the chief engineer stated that, in selecting the route over which the road was to be constructed, it was done with an eye single to the advantage of the railroad company, and without regard to the convenience of the citizens of the original town of Pontotoc; that he was, in finally locating this line, ignorant of and uninfluenced by the contention that there was an agreement alleged to be in existence for the perpetual maintenance of the depot as originally located, and without regard to and in ignorance of the fact that the petition for consolidation stated that the existing narrow-gauge line was to be broadened and standardized. In short, it appeared from this testimony that while the railroad company was desirous of conserving the public welfare, assisting in building up the business interests, and enlisting the friendly feeling of the citizens, and thereby secure their coöperation and patronage, all of these considerations were subordinate to the controlling and paramount object, which was to secure for the company the cheapest, most direct, and most practicable route. It was also contended—and this was made the main ground of the motion to dissolve—that citizens living both north and south of the town of Pontotoc, on the projected route of the railroad, were damaged and inconvenienced by the enforced delay in the construction of the road, and were deprived of freight, mail, and passenger facilities which would come to them by the operation of the road upon completion.

The decree of the chancellor was predicated upon this last consideration alone. The decree recites that the chancellor "doth find that all of the relief prayed by complainants in

their bill can be obtained by a mandatory injunction if the allegations thereof shall be sustained on a final hearing of the case, and the court shall then hold that they are entitled to any relief, or to the special relief asked in the prayer of the bill; and the court doth further find that the public interests of the country north and south of the town of Pontotoc, along the line of said railroad, as well as the interests of the railroad, will suffer by reason of the continuance of the temporary injunction; and for these reasons the motion to dissolve the injunction is hereby sustained, reserving all other questions until the final hearing." It will thus be noted that the chancellor announced no conclusion upon the facts, but based his decree solely upon the ground that, conceding the justice of the complainants' cause, they could still allow the work of construction to progress, and obtain that relief by mandatory injunction upon final hearing. This decree therefore does not come before us, and is not to be considered, in the light of the rule which requires the findings of a chancellor upon a question of fact to be sustained, unless manifestly wrong, because the decree affirmatively shows that the chancellor reserved his ruling upon all questions of fact, and remitted the parties litigant to this court for an adjudication to settle the principles of the cause, and serve as a guide during the future progress of the litigation.

Waiving minor considerations not sufficiently developed by the proof, as the record now stands, to enable us to reach a definite conclusion—such, for example, as what are the subsisting legal rights and obligations arising under the alleged written contract as to the original location of the depot—and all others which are not necessarily involved in the decision of the main propositions controlling the questions here presented, and passing at once to the very heart of the matter here presented, we find that the case naturally divides itself into two main branches: (1) What is the true interpretation to be given sec. 187 of our constitution, and has it any appli-

cation to the facts of this litigation?   (2) What are the legal rights of the citizens of the town of Pontotoc and the duties of the appellees as to the narrow-gauge road, which was in use and active operation before and at the consolidation hereinbefore referred to and at the date of the leasing of its property by one appellee to the other?

Section 187 provides that "no railroad hereafter constructed in this state shall pass within three miles of any county seat without passing through the same and establishing and maintaining a depot therein, unless prevented by natural obstacles; provided, such town or its citizens shall grant the right of way through its limits and sufficient grounds for ordinary depot purposes."   The contention of the appellants is that the term "county seat," used in this section, is to be given the meaning of that place or parcel of ground within the confines of which, under the law, the public buildings of the county are to be located; that the framers of the constitution meant to require every railroad company constructing a road under the conditions set out in the section to run its line through the limits, and establish and maintain a depot within the borders, of the county site, as it was originally established by the legislature. So it is contended that an extension of the limits of the municipality at and within which the county site is located does not extend the limits of the county site itself, but that those boundaries remain as they were at the date when the place was designated by lawful authority as the seat of justice of the county.   And, this being true, it is urged that an extension of the limits of the municipality would not affect or vary the duty of a railroad company desiring to construct and project a line passing within three miles of said original county site. We do not deem it necessary to enter upon any discussion of the argument which forms the basis of this contention.   Nor do we feel called on to intimate any opinion as to whether an extension of the corporate limits of a municipality within which is located the seat of justice of a county does or does

not extend the borders within which the public buildings may be located. However that may be, in interpreting the organic law of the state we must bear in mind the fundamental rule of constitutional construction. A constitution is framed for the guidance and government of the whole people, and words used therein are to be given their usual and popular significa- tion and meaning; and, unless that be the manifest intention of the framers of the instrument, phrases or terms susceptible of two different interpretations are not usually to be given a restricted, narrow, or technical construction. We are there- fore of the opinion that it was the design and intention of the framers of our constitution to require simply that railroads thereafter constructed, whose routes should pass within three miles of the town at which by law the county site was located, should pass through the corporate limits of the municipality, and establish and maintain a depot therein, one great evil which was sought to be guarded against being that companies organized for the real or ostensible purpose of constructing railroads would often extort large grants and donations of lands, money, or bonds from the towns or their citizens by the threat of locating the projected line of railroad just beyond the confines of the town, and there establishing a depot and build- ing up a rival market, having the advantage of railroad trans- portation and cheaper freight rates, against which the inland town, under the inexorable laws of commerce, could not hope to successfully contend, it being a matter of familiar knowl- edge that the location of a railroad within a short distance of a town not possessing similar or adequate transportation facil- ities necessarily and inevitably operates to the great detriment of the financial and business interests of such town. To protect the citizens of such towns from future unwise or extravagant grants of aid or credit to railroads, sec. 183 of the constitution was adopted, prohibiting the counties or municipal corporations from becoming subscribers to the capital stock of any railroad or from making any appropriation or lending its credit in aid

thereof, sec. 187 being adopted to protect county seats against the danger to which we have adverted, arising from the building of railroads near to, but not passing through, their corporte limits; the reason for the distinction which was made between county seats and other towns being most probably that the framers of the constitution realized that to make the section apply to all towns would inevitably tend to discourage the building of other railroads, and would thus materially retard the development of many sections of the state. Hence the section was restricted in its application to county seats alone, the purpose undoubtedly being to protect the interests of the county which had expended money in the erection of public buildings, and of citizens who had invested their money at the same place because of the existence of the buildings and the permanent location there of the seat of justice, by securing to such towns and their citizens the facilities and advantages afforded by railroad transportation, and protecting the property situated in such towns from being depreciated and practically destroyed in value by the building up of another competing town at the nearest point on the railroad. We hold that the true meaning of sec. 187 is that the burden is imposed upon every railroad company whose road passes within three miles of any county seat to run through the corporate limits of the town as they exist at the date of the construction of such road, and to maintain therein a depot, unless such construction be absolutely prevented, not by increased cost or greater engineering difficulty, but by "natural obstacles" which cannot reasonably be overcome.

An analysis of the wording of the section will demonstrate, we think, the absolute correctness of our conclusion that "county seat" is therein employed as synonymous with "municipality." The section provides that the "town or its citizens" shall grant a right of way through "its limits," referring plainly to the "citizens" and "limits" of the entire "town," and not alone to that portion which was first designated as the seat

of justice of the county. This view is strengthened when it is noted that a similar construction was seemingly placed on the provision by the legislature of the state by the enactment of ch. 12, p. 12, Acts 1897. That act was devised to vest municipal authorities "of any municipality which is a county seat" with necessary power to enable the town to comply with the proviso of sec. 187 under review, and authorizes them to issue bonds "for the purpose of buying rights of way through or into the limits of such municipality and sufficient grounds for ordinary depot purposes for any railroad company which will build its line through or into such municipality, according to the requirements of sec. 187 of the constitution," using the terms "county seat" and "municipality" interchangeably. The construction contended for by appellants, if adopted, might, and probably would, often defeat the object of the section. For, if "county seat" must be solely applied to the limits of the town as they existed when it became the seat of justice, it would be often practically impossible or financially prohibitory, in this day of high values, in prosperous and growing towns, for the citizens to acquire, without ruinous outlay, the right of way and necessary depot grounds within the narrow confines of the original town. Thus the section would become inoperative because of the inability of the town or its citizens, with due regard to business principles, to comply with its expressed proviso.

It must be noted that what we have said about the duty of a railroad company to build its line through a county seat is conditioned that the town or its citizens shall grant a right of way through its limits, and sufficient grounds for ordinary depot purposes. But a grant presupposes a request. The duty is imposed upon the railroad company of building its line through every county seat which it passes within three miles of. It can excuse itself for nonperformance of this duty in two ways only—by showing that it was prevented by "natural obstacles;" by showing that the town or citizens refused to make

the "grant" mentioned in the constitution. The initiative must be taken by the railroad company. No action is incumbent on the town or its citizens until the railroad company has evidenced an intention of locating its line within three miles of the town and has expressed a desire to receive the grant from the town. The constitution says to the railroad companies, "Ask and ye shall receive, or, in default thereof, may locate your line where you will;" but an asking and a refusal are conditions precedent to the lawful construction of a line within the distance mentioned without passing through a county seat. We make these latter observations to prevent the possibility of misconception of our meaning, and to dispose at the same time of the contention of appellees that they were absolved of all duty in this regard because they were not tendered a grant of right of way and depot grounds. In view of our conclusion that the building of any railroad which may be constructed hereafter through any portion of the corporate limits, and the establishment and maintenance of a depot at a convenient and accessible point, is a compliance with the mandate of sec. 187, the observations are of no further material value, save as an announcement of the judicial construction placed on the constitutional provision. We conclude on this branch of the case that appellees could not lawfully be required to construct the extension of the existing road or the newly projected line of road through what were the corporate limits of the original town of Pontotoc. Hence, under the facts of this record, appellants are afforded no relief by the language or intendment of sec. 187 of the constitution.

The second important inquiry presented for necessary decision is with reference to the rights and duties of the appellees, first, as between themselves; second, as between themselves, on the one hand, and the public, the citizens along the line of railroad, the railroad commission of Mississippi, and the state of Mississippi, in its sovereign capacity, on the other.

It appears from this record that the line of railroad actually constructed, belonging to, and operated by the Gulf & Chicago Railroad Company traversed the same territory, and followed for its entire length practically the same route, over which the Gulf & Chicago Railway Company was authorized by the proclamation of the governor to construct its projected line of road. Had there been no consolidation between these two corporations, had the Gulf & Chicago Railway Company constructed its projected line over the route and in the direction specified in its application for incorporation, between the terminal points stated therein, it would inevitably have been both a parallel and competing line with the narrow-gauge line then in existence, belonging to the Gulf & Chicago Railroad Company. Commencing at the town of Pontotoc, and running thence in a northerly direction through the counties of Union and Tippah to the town of Broomfield, near the state line, the place at or near which the projected line was to cross the boundaries of the state—points between which the narrow-gauge road was in actual operation—the geographical situation is such that the two lines would necessarily have run within a few miles, at most, of each other. Had, therefore, the Gulf & Chicago Railway Company constructed its road under the provisions of its charter, it could not, without the consent of the railroad commission, have changed its terminal points; and, however builded, within the grant of power given it by the charter, it would have been such a parallel or competing line that the consolidation between the two companies would not have been permitted. More than this, even an express grant of power by the legislature for the two companies to consolidate, or for one company "to lease or purchase, directly or indirectly, the opposing line, or any part thereof, or any interest therein," would have been void, as being in contravention of the general statutory inhibition against consolidation or purchase of competing lines of railroads, which cannot, without violating sec. 87 of the constitution, be suspended "for

the benefit of any individual or private corporation or association." *Y. & M. V. Ry. Co.* v. *So. R. Co.,* 83 Miss., 746 (36 South. Rep., 74).

Under the law (ch. 80, p. 95, Acts 1898), parallel or competing railroads are forbidden to consolidate, and other railroads are permitted to .consolidate only upon the approval of the railroad commission of the state.. This is the manifest meaning of Code 1892, § 3587. The consent of the railroad commission is a prerequisite to a valid consolidation between railroads not competing or parallel. It is for the commission to decide whether the public interest will be prejudiced or subserved by the proposed consolidation, and to withhold or grant permission accordingly. In the instant case it affirmatively appears from the petition for consent to the consolidation, and from the positive and emphatic testimony of one of the commissioners, whose energy, interest, and zeal we commend, that the chief inducement actuating the commission in granting its approval of the consolidation was that the narrow-gauge road then in operation between Pontotoc and Broomfield was to be broadened and standardized, and become a part of a single-track, standard-gauge, through line running between the terminal points stated in the charter, and thus, by connections with the great railway systems of the country, placing that section of the state in touch with the commercial centers of the nation. The statements in the petition for consolidation that the roads operated or projected by the companies constituting the proposed consolidation were "in no ways parallel or competing lines," and that the then existing narrow-gauge road was to be broadened and standardized, and "thereupon become a part of the line of railroad operated by the consolidated corporation," cannot be treated as mere idle averments of incidental matters. They were statements of jurisdictional facts, upon the existence of which depended the power of the corporations to consolidate. If the roads were competing or parallel, they could not consolidate. If the narrow-gauge road was not

broadened and standardized and used as a part of the contemplated through line, it would necessarily remain a competing line. Unless the narrow-gauge road can lawfully be abandoned in whole or in part, the validity of the consolidation is dependent upon the complete performance of the promise of the Gulf & Chicago Railway Company to adopt it as a part of the through line.

Passing for a moment to a consideration of the rights of the public with regard to the narrow-gauge line, as it existed prior to and at the time of the consolidation, it is only necessary to refer to the admirable opinion of Woods, J., in *Lusby* v. *Railroad,* 73 Miss., 364 (19 South. Rep., 239; 36 L. R. A., 510), to show that the railroad company owning that line was without power to abandon any portion of its line, as then in actual operation, under the guise of a relocation. The strong and cogent reasoning of that opinion cannot be strengthened or improved, and, secure in the unanswerable logic of that admirable and gifted judge, we content ourselves with a reaffirmance of the conclusions announced in that case. In that case, after discarding the contention that the corporation had the power "to abandon its original line and begin a new one" at some distance from its then location, the court proceeds: "Unable to consent to any such violent application of the doctrine of implied power in the case supposed, on principle, we must be equally unable to consent to any resort to implied power to relocate, change, and reconstruct a single mile, except in the extraordinary cases where imperious necessity requires deviation from the original line in order that the ends of the corporation's creation may not perish." The Gulf & Chicago Railroad Company could not itself, as owner, without violation of its duty to the state of Mississippi, to whose grace it owed its corporate existence, and disregarding the rights of the citizens along its line, whose property rights had become fixed by the original location of its line, abandon or relocate any portion thereof, except on the score of "imperious necessity"—an exception not suggested by the facts

of this record. "Having elected to take its original route, such election was final, and no change from motives of convenience or expediency or economy could be made without another legislative grant authorizing the change." *Lusby* v. *Railroad Co., supra.* It was under the duty of operating its line as then constructed to the town of Pontotoc. It was its duty to maintain a depot within the confines of that town. It could not abolish or disuse the depot therein established, or fail to keep up the same and to regularly stop the trains thereat, without the consent of the commission, unless, perhaps, as seemingly intimated in the case of *State* v. *A. & V. R. Co.,* 68 Miss., 653 (9 South. Rep., 469), a change in the site of the depot was imperatively demanded by business necessity or public convenience. And even in the state of case justifying such removal or change of site, it would have still been the duty of the company to locate the new depot on the line of its established route within the corporate limits of the town, at a site designated by the State Railroad Commission, unless the site selected by the railroad itself should be both convenient and accessible, due regard being had to the interest of the railroad and to the public convenience.

These were the duties of the railroad company owning the narrow-gauge line: The consolidation of the two corporations neither decreased the duties of the railroad nor impaired the rights of the public. If, therefore, these duties were devolved by law upon the owner of the road both before and after consolidation, and if the duty of maintaining and incidentally broadening and standardizing the narrow-gauge road then in existence was recognized and expressly assumed, as manifestly it was in the petition for permission to consolidate, certainly none of these duties were abrogated, but all became likewise obligatory on the lessee of the consolidated corporation. If the original owner of the road could not abandon it, as clearly, under the Lusby case, it could not; if the consolidated corporation which acquired the property could not abandon the road or abolish the depot in the town of Pontotoc—assuredly by no

principle of law can the lessee of the railroad be granted greater rights over the leased property than the owners possessed, or be charged with fewer duties towards the public, or be held to a less strict accountability to the law.

We hold, therefore, on this branch of the case, that it is the duty of the appellees to maintain, use, broaden, and standardize the narrow-gauge road formerly belonging to the Gulf & Chicago Railroad Company, so that it shall become a part of "the line of railroad operated by the consolidated corporation," as in their petition for consolidation the consolidating corporations obligated themselves to make it.

It is contended by the appellees that as a railroad company is granted by Code 1892, § 3599, the right, after beginning the construction of its road, "to make all necessary or proper changes in its course or direction from that specified in the application for its incorporation," therefore it was within the power of the Mobile, Jackson & Kansas City Railroad Company to make any desired change during the construction of its road, even though such deviation necessitated the abandonment of some portion of the narrow-gauge line. Such is not the meaning of the law. Section 3599 is simply intended to enable railroad companies to cope with such unforeseen contingencies as may arise in the actual construction of the projected road after its general course and direction have been mapped out and approved in the manner pointed out by law, so that the building of a road might not be prevented or its cost unduly increased by some natural obstruction arising from the character of the soil, the topography of the country, or other difficulties which might not be discovered until the work of actual construction began. But that is not this case. The instant case deals with a road already constructed, equipped, and in actual operation, a portion of which is now sought to be abandoned. A railroad company has no power to ignore and disregard the rights of the public, growing out of and fixed by the location and establishment of its road. Nor would the State Railroad Commission

have the right to authorize any portion of the road to be abandoned or changed to the detriment or damage of the interests of the citizens who have acquired property and business interests with reference to its original location. Once located, a railroad is permanently located for the whole term of its existence, subject only to the exception of a specially granted express legislative enactment authorizing a change or relocation. If the Gulf & Chicago Railway Company, or its lessee, the Mobile, Jackson & Kansas City Railroad Company, shall extend its line from the terminus of the narrow-gauge road in the town of Pontotoc (and any extension must begin from that point), it may do so over whatever be the most feasible, convenient, and desirable route, without reference to the corporate limits of the original town of Pontotoc. Where its new depot shall be located—in what portion of the town—is a matter not involved in this litigation, and is a question for future discussion between the appellees and the railroad commission. But it must be established and maintained either at the old depot site, or, if not bound by a lawful and enforceable contract to maintain it at that place, then at a convenient and accessible point, with due regard to the interests of the railroad and the public convenience. Should the appellees select a new site which is inconvenient or inaccessible, then the commission is empowered by Code 1892, § 4309, to designate the location and enforce obedience to its order.

In the extension of the road, under the facts of the instant case, there is no burden imposed on the citizens of the town of Pontotoc to grant either right of way or grounds for depot purposes. This is not a case of the construction of a new line passing within three miles of a county seat, for this road already runs into the county seat. This is simply an extension of an established line, made for the convenience and dictated by the corporate policy of the railroad company. It is vested with ample power under its right of eminent domain to acquire or condemn all lands needed for right of way or necessary depot grounds.

We think it unnecessary to discuss the contention that the state of Mississippi is not a proper party to a suit of this kind. The state is always a proper party to a proceeding instituted to protect the rights of the public, and to finally terminate a willful ignoring of its duties under the statutes of the state, and a persistent violation of its charter powers, by a corporation of a *quasi* public nature.

The decree of the chancellor must be reversed.

It may be true that the convenience of the citizens both north and south of Pontotoc is abridged and curtailed, and their enjoyment of railroad facilities postponed, by the temporary injunction. It may be true that the business interests of the railroad company may suffer until the line of road is completed. But we cannot on that account ignore the fact that the citizens of the town of Pontotoc have rights, regardless of the alleged contract as to the site of the depot, growing out of the location of this road, which must be protected. Nor can we be oblivious of the further facts that the public policy of the state, as defined by the adjudication of this court and as embodied in our statute laws, are being violated, and that the orders of the railroad commission, to which these appellees are justly subject, are being disobeyed. We cannot permit wrong to be inflicted on one class of citizens, who have rights already acquired and fixed under the law, even though a continuance of the wrong might result in indirect benefit to others. Nor can we allow a violation of the law, an ignoring of the rights of the public, and a defiance of the orders of the commission to continue, on the plea that an injunction preventing these things may operate prejudicially to the rights of the railroad corporations whose failure to discharge their legal obligations is itself the cause of the damage and the delay.

*The decree is reversed, the injunction reinstated, and the cause remanded.*